# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DANIEL CORTEZ-LAZCANO, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Case No. 19-CV-0095-GKF-JFJ |
| | ) |
| RICK WHITTEN,[1] | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Petitioner Daniel Cortez-Lazcano seeks federal habeas relief, under 28 U.S.C. § 2254, from the judgment entered against him in the District Court of Tulsa County, Case No. CF-2013-171. He claims his custody under that judgment violates the Constitution because (1) the prosecutor used peremptory strikes in a discriminatory manner to excuse African-American jurors from the jury panel, in violation of the Fourteenth Amendment's equal protection clause, (2) his attorney performed deficiently and prejudicially during pretrial plea negotiations, in violation of his Sixth Amendment right to counsel, by failing to convey a favorable plea offer, (3) the prosecutor initiated his prosecution with a charging document that did not provide sufficient notice of the charges against him, in violation of the Sixth and Fourteenth Amendments, and (4) the prosecutor committed misconduct that deprived him of his Sixth and Fourteenth Amendment rights to a fair trial.  Having considered the petition for writ of habeas corpus (Dkt. 1), the brief in support of the petition (Dkt. 6), Respondent Rick Whitten's response in opposition to the petition (Dkt. 12), the

---

[1] Cortez-Lazcano is currently incarcerated at the North Fork Correctional Center (NFCC), in Sayre, Oklahoma.  The Court therefore substitutes the NFCC's current warden, Rick Whitten, in place of Jimmy Martin, as party respondent.  Fed. R. Civ. P. 25(d); Rule 2, *Rules Governing Section 2254 Cases in the United States District Courts*.  The Clerk of Court shall note on the record this substitution.

record of state court proceedings (Dkts. 12-1 through 12-8, 13, 14), and applicable law, the Court finds and concludes that 28 U.S.C. § 2254(d) bars relief as to each of Cortez-Lazcano's claims. The Court therefore denies his request for an evidentiary hearing and denies the petition.

## *BACKGROUND*

In November 2012, nine-year-old V.C. told her older sister and their mother that Cortez-Lazcano sexually abused her "several times" and that the last incident of abuse occurred in September 2012, after V.C. went to the fair with her older sister and Cortez-Lazcano. [Dkt. 13-8, Tr. Trial vol. 4, at 15-31, 119-28; Dkt. 13-9, Tr. Trial vol. 5, at 48-55.][2] Following an investigation, the State of Oklahoma charged Cortez-Lazcano with committing two counts of sexual abuse of a child under the age of twelve, in violation of Okla. Stat. tit. 21, § 843.5(F). [Dkt. 13-10, O.R., at 19.] In the information, filed January 11, 2013, the State alleged Cortez-Lazcano "willfully or maliciously put[] his penis in the vagina of V.C." (count one), and "willfully and maliciously touch[ed] the vagina of V.C." (count two) "on or about between 12/27/2007 and 10/5/2012" when V.C. was between the ages of five and nine years old. [Dkt. 13-10, O.R., at 19.]

Represented by attorney Mark Matheson, Cortez-Lazcano waived his right to a preliminary hearing and rejected pretrial plea offers. [Dkt. 13-1, Tr. Hr'g (June 6, 2014), at 2; Dkt. 13-5, Tr. Trial vol. 1, at 4-10.] After multiple continuances, the case was tried to a jury in April 2016. [Dkt. 13-10, O.R., at 8-13.] The jury found Cortez-Lazcano guilty as to count one and not guilty as to count two, and recommended a sentence of 25 years' imprisonment. [Dkt. 13-9, Tr. Trial vol. 5, at 278-80.] The trial court sentenced Cortez-Lazcano accordingly, and imposed a term of nine to twelve months' post-imprisonment supervision. [Dkt. 13-4, Tr. Sentencing Hr'g, at 12; Dkt. 13-10, O.R., at 142.]

---

[2] For consistency, the Court's citations refer to the CM/ECF header pagination.

Represented by appellate attorney Velia Lopez, Cortez-Lazcano filed a direct appeal in the Oklahoma Court of Criminal Appeals (OCCA), asserting ten claims.  [Dkt. 12-2, Appellant's Br., at 2-4.]  The OCCA rejected each claim on the merits, modified the judgment and sentence to include a three-year term of post-imprisonment supervision, as required by state law, and otherwise affirmed the judgment and sentence.  [Dkt. 12-1, *Cortez-Lazcano v. State*, Case No. F-2016-606 (Okla. Crim. App. 2017) (OCCA Op.), at 1-9.]

In the instant federal habeas petition, Cortez-Lazcano, represented by habeas attorney James Hankins, raises four of the federal claims he presented to the OCCA on direct appeal.[3]

## *DISCUSSION*

Because the OCCA adjudicated the merits of each claim Cortez-Lazcano asserts in the petition, Cortez-Lazcano must make a threshold showing that the OCCA's adjudication of the claim resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated by "the holdings" of the Supreme Court's "decisions as of the time of the relevant state-court decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  A state court's decision is contrary to Supreme Court precedent "if: (a) 'the state court applies a rule that contradicts the governing law set forth in Supreme Court cases'; or (b) 'the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result

---

[3] Additional facts relevant to those four claims will be developed in the analysis section.

different from [that] precedent.'" *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008) (quoting

*Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006)).  Notably, the state court need not mention,

or even be aware of, relevant Supreme Court cases, "so long as neither the reasoning nor the result

of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

When the state court "'identifies the correct governing legal principle' in existence at the

time" of its decision, the only question under § 2254(d)(1) is "whether the decision 'unreasonably

applies that principle to the facts of the prisoner's case.'" *Cullen v. Pinholster*, 563 U.S. 170, 182

(2011) (quoting *Williams*, 529 U.S. at 413).  To establish that the decision resulted from an

objectively unreasonable application of the law, a petitioner must show something more than an

erroneous application of the law.  Rather, the petitioner "must show that the state court's ruling on

the claim being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

A petitioner may also challenge the reasonableness of factual underpinnings of the state

court's decision on a federal claim.  Under § 2254(d)(2), a petitioner must show that the state

court's decision is based on "an unreasonable determination of the facts" that were developed in

the state court proceeding.  "A state-court decision unreasonably determines the facts if the state

court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the

misapprehension goes to a material factual issue that is central to petitioner's claim.'" *Wood v.*

*Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting *Byrd v. Workman*, 645 F.3d 1159,

1170-72 (10th Cir. 2011)).  But "a state-court factual determination is not unreasonable merely

because the federal habeas court would have reached a different conclusion in the first instance."

*Wood v. Allen*, 558 U.S. 290, 301 (2010).  Rather, under § 2254(d)(2), the reasonableness of a

factual determination is measured by *Richter*'s fairminded-disagreement standard.   *Dunn v. Madison*, 138 S. Ct. 9, 12 (2017); *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (*per curiam*) (reiterating that "if [*Richter*'s] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision).[4]

Together, both subsections of § 2254(d) "stop[] short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102. Congress made § 2254(d)'s standards demanding "to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions."  *Id.* at 102-03.  In contrast, federal courts provide a secondary forum for state prisoners to obtain federal habeas relief from a state conviction only in cases demonstrating "extreme malfunctions in the state criminal justice systems." *Richter*, 562 U.S. at 102.

Finally, even if a petitioner meets § 2254(d)'s demanding standards, the petitioner is not necessarily entitled to federal habeas relief. *Milton v. Miller*, 744 F.3d 660, 670 (10th Cir. 2014). Instead, the petitioner is entitled to have the federal court review his claims de novo, without deference to the state court's decision.  *Id.* at 670-71.  In that situation, the federal court will independently determine whether any alleged constitutional errors occurred and, if so, whether those errors are harmless "under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619, 631 (1993)]." *Fry v. Pliler*, 551 U.S. 112, 121 (2007).

---

[4] In addition, a federal court must presume the correctness of the state court's factual findings unless the petitioner rebuts that presumption "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## I.     Discriminatory use of peremptory challenges (*Batson* claim)

Cortez-Lazcano first claims that the prosecutor, Andrea Brown, used the State's peremptory challenges with a discriminatory purpose to excuse four prospective African-American jurors, Z.C., D.R., K.M. and B.B., in violation of the Fourteenth Amendment's equal-protection clause, as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. [Dkt. 6, Pet'r's Br., at 14-18.]

### A.     Clearly established federal law

Under clearly established federal law, "a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2234 (2019) (citing *Batson*).[5]  In evaluating a *Batson* challenge, the trial court applies a three-step burden-shifting framework:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal citations omitted) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (*per curiam*)).  Appellate courts apply the same framework and, like the trial court, must consider "all of the circumstances that bear upon the issue of racial animosity" in

---

[5] Because the Supreme Court decided *Flowers* almost two years after the OCCA issued its decision affirming Cortez-Lazcano's judgment and sentence, the Court cites *Flowers* only to the extent it discusses Supreme Court precedent that was clearly established as of 2017, when the OCCA issued its decision in this case.  *Andrade*, 538 U.S. at 71.

determining whether the opponent of the strike has shown purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Nonetheless, an appellate court must give a trial court's factual "findings great deference" and sustain the trial court's "ruling on the issue of discriminatory intent . . . unless it is clearly erroneous." *Flowers*, 139 S. Ct. at 2244; *see also Snyder*, 552 U.S. at 477 (discussing the trial court's "pivotal role" in discerning discriminatory intent at *Batson*'s third step which requires the trial court to make credibility determinations based on the trial court's "firsthand observations" of the demeanor of both the prosecutor and prospective jurors). Federal habeas review of a state court's factual findings regarding a *Batson* claim is even more deferential. *See Collins*, 546 U.S. at 343-44 (Breyer, J., concurring) (discussing *Batson* and noting that "considerations of federalism require federal habeas courts to show yet further deference to state-court judgments"). A federal habeas court's review of a *Batson* claim is guided by both § 2254(d)(2)'s requirement that the state-court's factual determination must be unreasonable in light of the evidence presented in state court and § 2254(e)(1)'s presumption that a state court's factual findings are presumed correct absent clear and convincing evidence to the contrary. *Grant*, 886 F.3d at 949-50.

In short, trial courts are uniquely situated to make the factual findings based on credibility determinations required by the *Batson* framework, appellate courts "will, and must, grant the trial courts considerable leeway in applying *Batson*" and affirm their factual findings unless those findings are clearly erroneous, and federal habeas courts reviewing a *Batson* claim must permit a "state-court factual determination [to] stand unless [that determination is] 'unreasonable.'" *Collins*, 546 U.S. 333, 343-44 (Breyer, J., concurring).

B.    **Analysis**

At trial, Cortez-Lazcano objected to the State's use of strikes to excuse Z.C., D.R., K.M. and B.B, primarily arguing that Brown's use of four of the six peremptory challenges allotted to the State evidenced a pattern of racial discrimination.  [Dkt. 13-6, Tr. Trial vol. 2, at 248-57.]  At the trial court's request, Brown offered facially race-neutral reasons for each strike, and the trial court overruled Cortez-Lazcano's objections and excused all four prospective jurors.  [Dkt. 13-6, Tr. Trial vol. 2, at 248-57.]

Cortez-Lazcano presented his *Batson* claim to the OCCA on direct appeal.  There, he argued that the trial court abused its discretion and "failed to properly apply the *Batson* standard" because (1) Brown misstated the applicable law more than once, (2) Brown's stated reasons for the strikes were pretextual, and (3) several jurors had legal issues similar to K.M. but Brown only struck K.M. and permitted one nonblack juror with similar legal issues, Juror H., to sit on the trial jury.  [Dkt. 12-1, Appellant's Br., at 14-19.]  The OCCA rejected the *Batson* claim, stating,

> Appellant argues in Proposition One that the prosecutor used peremptory strikes to remove prospective jurors because of their race.  *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).  He preserved this issue for appeal by objecting to the prosecutor's peremptory strikes.  In response, the prosecutor offered race-neutral reasons for the challenged strikes.  The trial court removed the prospective jurors, finding that the defendant had not shown purposeful discrimination.  These findings are entitled to great deference on appeal, and we review the record in the light most favorable to the trial court's ruling.  *Mitchell v. State*, 2011 OK CR 26, ¶ 41, 270 P.3d60, 173.  We find the trial court properly overruled Appellant's *Batson* objections.  Proposition One is denied.

[Dkt. 12-1, OCCA Op., at 3.]

In this proceeding, Cortez-Lazcano argues that the OCCA's rejection of his claim was unreasonable because (1) Brown's statements suggested a misunderstanding of the law, (2) Brown's stated reasons for the strikes were "dubious," "nonsensical," and "pretextual," and (3) the OCCA "did not engage in" a comparative-juror analysis regarding jurors with legal issues

similar to K.M.  [Dkt. 6, Pet'r's Br., at 14-20.]  Whitten contends that § 2254(d) bars relief as to this claim.  [Dkt. 12, Resp., at 12-23.]

Having reviewed the record with the appropriate level of deference, the Court agrees with Whitten that § 2254(d) bars relief because it was objectively reasonable for the OCCA to determine that the trial court's factual findings were not clearly erroneous.

### 1.      Z.C.

When Brown used the State's second peremptory strike to excuse Z.C., Cortez-Lazcano's attorney, Mark Matheson, objected, arguing that Z.C. was "one of the few minorities on the panel" and that it was improper to strike him.  [Dkt. 13-6, Tr. Trial vol. 2, at 248.]  Brown asserted that the striking of one minority juror does not establish a pattern of discriminatory strikes and objected to the need to give a race-neutral reason for the strike, but the trial court asked if she would provide one.  [Dkt. 13-6, Tr. Trial vol. 2, at 248-49.]  Brown then stated, "[Z.C.] is the grandson of a defense attorney, Mr. Linger.  I have had several cases with Mr. Linger.  He practices, to my knowledge, almost exclusively criminal defense attorney – criminal defense work, and I strike his grandson from my panel."  [Dkt. 13-6, Tr. Trial vol. 2, at 249.]  The trial court stated, "Okay. I will allow that [juror] to be stricken. And overrule Mr. Matheson's *Batson* challenge."  [Dkt. 13-6, Tr. Trial vol. 2, at 249.]

Cortez-Lazcano appears to challenge the OCCA's decision to affirm this ruling on two grounds.  First, he takes issue with Brown's statement that striking one juror does not establish a pattern of discrimination and suggests this statement might have adversely influenced the trial court's ruling.  [Dkt. 6, Pet'r's Br., at 15.]  The Court fails to see how.  Despite Brown's objection to providing a race-neutral reason, the trial court moved on to *Batson*'s second step and asked for one, and Brown gave one.  *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a

prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

Second, Cortez-Lazcano describes Brown's reason for striking Z.C. as "dubious" and "pretextual" and appears to argue that the trial court and the OCCA ignored that Z.C. not only had a grandfather who was a criminal defense attorney but a grandmother who worked in law enforcement. [Dkt. 6, Pet'r's Br., at 15, 20.] How that advances the argument that Brown's strike was impermissibly based on Z.C.'s race is unclear. Regardless, Cortez-Lazcano's expressed doubt about Brown's proffered reason does not rebut the presumption that the trial court's factual findings regarding this strike are correct or support his view that the OCCA should have rejected those findings as clearly erroneous. During voir dire, Brown asked all prospective jurors if anyone had ties to law enforcement. [Dkt. 13-6, Tr. Trial vol. 2, at 89-90.] Eight prospective jurors, including Z.C., responded that they had friends or family in law enforcement; all eight, including Z.C., stated they could nonetheless be fair and impartial. [Dkt. 13-6, Tr. Trial vol. 2, at 90-99.] Z.C. identified his grandmother as a "Corporal Sheriff" who works at a county jail and who also works as a private investigator, volunteered that his grandfather is a criminal defense attorney, and stated that he did not really talk to either grandparent about their cases or the substance of their work. [Dkt. 13-6, Tr. Trial vol. 2, at 96-99.] Brown commented that she knew Z.C.'s grandfather well. [Dkt. 13-6, Tr. Trial vol. 2, at 98.]

On this record, it was objectively reasonable for the OCCA to defer to the trial court's ruling that Brown's reason for striking Z.C. was race-neutral and not indicative of purposeful racial discrimination.

2.      **D.R.**

Brown used the State's third strike to excuse D.R., and Matheson objected, arguing that

the State's use of two out of three strikes to remove minorities had "become a pattern." [Dkt. 13-6,

Tr. Trial vol. 2, at 249-50.]  The trial court seemed to agree, and Brown stated:

> First of all, just for the record, both [Z.C.] and [D.R.] are black and the defendant is not.
>
> Second, there are a number of minorities on this panel.  And, obviously, the record is black and white and color-blind.  But these are not the only two persons of minority on this panel.  That being said, my race-neutral reason for striking D.R. is abundant.
>
> First and foremost, he doesn't know anything about any of his own children. He literally couldn't even tell us the range of ages of his own biological children. He struggled even farther in telling us how many grandchildren he has and what age or ages they are.  This is a person that, in the State's opinion, doesn't care a whole lot about his own children enough to pay enough attention to at least how old they are or how long it's been since he was or wasn't present when they were born.  On top of that, he has been on probation for felony drug possession, and I don't like that.  So I'm going to move to strike [D.R.].

[Dkt. 13-6, Tr. Trial vol. 2, at 250-51.]  Matheson made no further argument, and the trial court

allowed the strike over Matheson's objection.  [Dkt. 13-6, Tr. Trial vol. 2, at 251.]

Cortez-Lazcano appears to make two arguments to support his view that the OCCA

unreasonably applied *Batson* or unreasonably determined the facts when it affirmed this ruling.

First, he argues Brown "offered yet another complete misunderstanding of the law" by asserting

that Z.C. and D.R. were black and Cortez-Lazcano is not.  [Dkt. 6, Pet'r's Br., at 16]; *see Powers*

*v. Ohio*, 499 U.S. 400, 415-16 (1991) ("To bar petitioner's claim because his race differs from that

of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor,

and privilege of jury service.").  But nothing in the record suggests that either the trial court or the

OCCA barred Cortez-Lazcano's objection to striking D.R. based on Brown's alleged

"misunderstanding" that the party opposing the strike need not be the same race as the stricken

juror.  And, as Whitten argues, Brown's statement could reasonably be read as Brown's attempt to create a more complete record regarding the racial makeup of stricken jurors for later appellate review.  [Dkt. 12, Resp., at 17.]

Second, Cortez-Lazcano describes Brown's stated reason for striking D.R.—his struggle to remember the ages of his children and number of grandchildren—as pretext for discrimination. [Dkt. 6, Pet'r's Br., at 16, 20.]  But his mere assertion of pretext, even in light of the fact that Brown excused four of five African Americans from the jury panel, does not establish that the trial court clearly erred in crediting Brown's reason for excusing D.R.  During the trial court's general examination of prospective jurors, the trial court and D.R. engaged in the following conversation:

| | |
|---|---|
| [D.R.]: | . . . I was married twice.  I have eight children and several grandchildren. |
| The Court: | Are you married now? |
| [D.R.]: | No, sir. |
| The Court: | And how many children? |
| [D.R.]: | Eight. |
| The Court: | Eight children? |
| [D.R.]; | By two marriages. |
| The Court: | What are the ages? |
| [D.R.]: | 50 - - I can't remember all of them - - 46, 45, 32. |
| The Court: | 32? |
| [D.R.]: | 28.  They all kind of stair-step. |
| The Court: | How about grandkids?  You got to have grandkids with that group. |
| [D. R.]: | Yes, I have several grandkids, also.  I have - - my second oldest son has three. My third oldest son has two.  My daughter has one.  My other daughter has three. |

| The Court: | Can you give just the range of ages of your grandchildren? |
|---|---|
| [D. R.]: | 12, 14 - - |
| The Court: | 12 down to what? 12 years down to what, like a baby? |
| [D. R.]: | 12 down to 7. |

[Dkt. 13-6, Tr. Trial vol. 2, at 26-27.]  On the cold habeas record, Brown's characterization of D.R. as a purportedly uncaring father and grandfather who "struggled" to recall the number and ages of his children and grandchildren seems less than charitable.  And "a prosecutor's misrepresentations of the record when defending" a strike is one factor to consider in ruling on a *Batson* challenge. *Flowers*, 139 S. Ct. at 2243.  But that is why double deference plays a significant role in a federal habeas court's review of a *Batson* claim.  The trial court engaged in conversation with D.R., and Brown, Matheson and Cortez-Lazcano were all present for that conversation.  Each could make firsthand observations of whether D.R., in fact, struggled to recall the number and ages of his children and grandchildren or whether he was simply slow to respond to the trial court's questions. The OCCA could, and this Court can, only speculate as to the same.  And nothing in the record indicates that Matheson opposed the strike because Brown mischaracterized D.R.'s ability to respond.  Rather, the only apparent objection Matheson presented to the trial court was that Brown used two of the State's first three strikes to excuse prospective jurors who were minorities.  [Dkt. 13-6, Tr. Trial vol. 2, at 250-51.]  True enough, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."  *Batson*, 476 U.S. at 97. But if the trial court, who could observe the prosecutor's demeanor and D.R.'s demeanor, made that inference, the trial court necessarily found that any such inference was not sufficient to prove purposeful discrimination when it overruled the objection.  The OCCA found no clear error, and this Court cannot say that it was objectively unreasonable for the OCCA to do so in light of the facts presented in state court.

### 3. K.M.

Brown used the State's fifth peremptory strike to excuse K.M.  [Dkt. 13-6, Tr. Trial vol. 2, at 251.]  Matheson objected, asserting that the State's use of three out of five strikes to excuse minorities from the jury panel was "definitely a pattern."  [Dkt. 13-6, Tr. Trial vol. 2, at 252.]  In response, Brown stated,

> And, Your Honor, the law is extraordinarily clear.  I can strike as many minorities as I want as long as there's a race-neutral reason.  It doesn't have anything to do with skin color.  And I have given a very clear race-neutral reason for each one of my strikes, and I have a very clear race-neutral reason for my striking [K.M.]
>
> [K.M.] has been arrested for domestic violence and admitted that she committed the crime.  But more important than that, at the bench when we were up there, she told us that her husband worked at the Laura Dester Shelter.  The Laura Dester Shelter where children are taken when DHS takes them into emergency custody.  She told us at the bench, in private, that her husband was repeatedly accused at the Laura Dester Shelter of physically abusing the children in the shelter and that ultimately he was terminated for abusing children in the Laura Dester Shelter.  That is a race-neutral reason to get rid of her on a child sexual abuse case.

[Dkt. 13-6, Tr. Trial vol. 2, at 252-53.]  The trial court stated, "And again, she's African-American and the defendant is Hispanic, I take it. "  [Dkt. 13-6, Tr. Trial vol. 2, at 253.]  Matheson pointed out that Cortez-Lazcano is "still a minority."  [Dkt. 13-6, Tr. Trial vol. 2, at 253.]  The trial court permitted the strike over Matheson's objection, stating, "I'll allow it."  [Dkt. 13-6, Tr. Trial vol. 2, at 253.]

Cortez-Lazcano argues the OCCA's decision to affirm the trial court's ruling as to K.M. is unreasonable for two reasons.  First, he argues that the trial court's references to the different races of K.M. and Cortez-Lazcano demonstrates that Brown's alleged misunderstanding of applicable law influenced the trial court's ruling.  [Dkt. 6, Pet'r's Br., at 17.]  As previously stated, the defendant and the stricken juror need not be of the same race, and even a nonminority defendant can assert a *Batson* challenge if a minority prospective juror is stricken.  *Flowers*, 139 S. Ct. at

2243.  To be fair, Matheson's response that Cortez-Lazcano is also a minority seems to reflect the same alleged misunderstanding of the law.  In any event, as before, Cortez-Lazcano fails to explain why this Court should view the OCCA's decision or the trial court's factual findings as a product of that alleged misunderstanding of the law when the record supports the trial court's factual findings that Brown's stated reason for excusing D.M. was facially race-neutral and not based on purposeful racial discrimination.  During voir dire, Brown asked prospective jurors about their involvement, if any, in a criminal case, and K.M. responded that she had been charged in 2007 with misdemeanor domestic assault, that she paid a fine and served six months' probation, and that her record had been expunged.  [Dkt. 13-6, Tr. Trial vol. 2, at 43, 50-51.]  When Brown asked the panel of prospective jurors whether any had experience with child abuse or child sexual abuse, six prospective jurors, including K.M., responded that they had.  [Dkt. 13-6, Tr. Trial vol. 2, at 100-24.]  Only K.M. asked to share her experience in private.  [Dkt. 13-6, Tr. Trial vol. 2, at 115.]  At the bench, K.M. explained that before she married her husband, her husband's brother and sister-in-law were involved in a child abuse case and had their children removed from the home.  [Dkt. 13-6, Tr. Trial vol. 2, at 116.]  K.M. also stated that her husband "worked in Laura Dester until sometime last year and he had many accusations over the years that he worked there of physical abuse," and that the last accusation resulted in the termination of his employment but no criminal charges.  [Dkt. 13-6, Tr. Trial vol. 2, at 116.]  Viewing this record with double deference, the Court finds no support for Cortez-Lazcano's apparent assertions (1) that the trial court should have rejected Brown's stated reasons for striking K.M. as pretext for racial discrimination and (2) that the OCCA should have rejected the trial court's factual finding that no discrimination occurred as clearly erroneous.

Second, Cortez-Lazcano appears to fault both the trial court and the OCCA for failing to "engage" in a comparative analysis of other prospective jurors who, like K.M., had involvement in a criminal case but, unlike K.M., were not minorities and were not stricken by the State. [Dkt. 6, Pet'r's Br., at 17, 19-20.] As Cortez-Lazcano asserts, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). And, as he did on direct appeal, Cortez-Lazcano identifies several prospective jurors who, like K.M., had prior involvement in a criminal case, either individually or through a family member. [Dkt. 6, Pet'r's Br., at 17 n.1.] He does not say, however, whether any of these prospective jurors served on the trial jury or whether any were nonblack. [Dkt. 6, Pet'r's Br., at 17 n.1.] Further, Cortez-Lazcano argues that K.M. was stricken based on the fact that her husband was accused of abusing children at the Laura Dester Shelter, whereas Juror H., who is described as nonblack, served on the jury even though his "cousin had been convicted of child molestation." [Dkt. 6, Pet'r's Br., at 17.] Cortez-Lazcano's comparative-juror-analysis argument is not persuasive for several reasons. First, any criticism regarding the trial court's failure to conduct a comparative-juror analysis seems misplaced given that none of Matheson's objections identified for the trial court any comparable nonblack jurors who were permitted to serve on the jury. As previously discussed, the primary argument at trial was that Brown's strikes signified a pattern of discrimination. Second, and relatedly, it is not clear from the OCCA's decision whether it either implicitly performed a comparative-juror analysis, and found it unworthy of discussion, or determined the record was not sufficiently developed to perform that analysis. Regardless, as Whitten argues, neither *Batson* nor any of its progeny held that a state court must, in every case, conduct a comparative-juror analysis. [Dkt. 12, Resp., at

19-20]; *see Grant*, 886 F.3d at 950-51 ("At the outset, it is important to clarify what *Batson* and

its progeny do *not* expressly hold.  This line of cases does not explicitly state that comparative

juror evidence, standing alone, must be accorded determinative effect with regard to the question

of racially-motivated discrimination." (emphasis in original)).  And engaging in that analysis at

the appellate level can be particularly problematic when, as here, the party opposing the strike

failed to identify for the trial court any allegedly comparable jurors who were not stricken by the

State.  *See Flowers*, 139 S. Ct. at 2264 (2019) (Thomas, J., dissenting) (noting that "'a retrospective

comparison of jurors based on a cold appellate record may be very misleading when alleged

similarities were not raised at trial' because 'an exploration of the alleged similarities at the time

of trial might have shown that the jurors in question were not really comparable.'" (quoting *Snyder*,

552 U.S. at 483))).  Even assuming the OCCA did not engage in a comparative-juror analysis, the

Court cannot say, under the facts of this case, that the OCCA's decision is therefore based on an

unreasonable application of *Batson*.  Third, and finally, even if this Court were not constrained by

the AEDPA's framework, the cold habeas record does not support Cortez-Lazcano's argument

that a comparison of K.M. and Juror H. likely would have resulted in either the trial court or the

OCCA finding that Brown engaged in purposeful discrimination by striking K.M.[6]  As just

discussed, Brown gave two reasons for excusing K.M.: (1) K.M.'s prior charge of misdemeanor

domestic assault and (2) "more important[ly]," K.M.'s recent experience with her husband being

---

[6] As previously discussed, Cortez-Lazcano identifies several other prospective jurors, in a footnote, and argues their involvement in criminal cases was comparable to that of K.M.  But he does not say whether those prospective jurors sat on the jury or whether they were nonblacks.  The Court is likely stretching the AEDPA's bounds by comparing K.M. to Juror H. when it is not apparent that any state court did so or was unreasonable for failing to do so.  But the Court declines to travel even further out of bounds by searching the record for incomplete data to compare the additional prospective jurors with K.M., particularly when Cortez-Lazcano appears through habeas counsel.

terminated from his employment with the Laura Dester Shelter following allegations that he physically abused children at the shelter.  [Dkt. 13-6, Tr. Trial vol. 2, at 252-53.]  Like K.M., Juror H. raised his hand (as did eight additional prospective jurors), when Brown questioned all prospective jurors about their personal involvement in a criminal case, or any involvement in a criminal case by a friend or family member.  [Dkt. 13-6, Tr. Trial vol. 2, at 43, 50-51, 58.]  Juror H. explained that his cousin had been charged with (not wrongfully convicted of) child molestation, over 16 or 17 years earlier, that the charges had been dropped before trial, that he thought the charge was "[a] trumped charge" fabricated by his cousin's ex-girlfriend, and that he was not close to his cousin because his cousin passed away some time ago.  [Dkt. 13-6, Tr. Trial vol. 2, at 58-60, 188-89.]  Given that the primary basis for excusing K.M. was her husband's recent termination based on allegations of child abuse, it would not have been objectively unreasonable for either the trial court or the OCCA to find that Juror H.'s much less recent experience of having a now-deceased cousin accused of child molestation by an ex-girlfriend was not sufficiently comparable to demonstrate that Brown's reason for excusing K.M., while permitting Juror H. to serve, was pretext for purposeful racial discrimination.

### 4. B.B.

Matheson and Brown were each given one peremptory strike to eliminate two of the three remaining prospective jurors, which would leave the remaining prospective juror to serve as the alternate.  [Dkt. 13-6, Tr. Trial vol. 2, at 253-54.]  Brown used this strike to excuse B.B., an African-American.  [Dkt. 13-6, Tr. Trial vol. 2, at 253-54.]  Matheson objected, arguing the State had used its six peremptory strikes to excuse four African-Americans from the panel, leaving only one minority on the panel and establishing a "clear pattern" of discrimination.  [Dkt. 13-6, Tr. Trial vol. 2, at 254.]  Brown argued that there were, in fact, two minorities left to serve on the jury and

that one was African-American.  [Dkt. 13-6, Tr. Trial vol. 2, at 255.]  Brown further argued that

she had given race-neutral reasons for each strike.  [Dkt. 13-6, Tr. Trial vol. 2, at 255.]  Regarding

B.B., Brown stated she used the "process of elimination" to decide which of the three remaining

prospective jurors should be excused and explained,

> Of the three choices, [D.S.], who sits in box number 25, her husband is
> retired Tulsa Fire Department.  He[r] husband's a church administrator.  She's
> voted guilty on a criminal jury trial in the past.  She's fostered two children who
> were put in her care through DHS and ultimately gone on to adopt both of those
> children.  I think she would be a wonderful juror and I have no intention of striking
> her.
>
> And [B.K.], who's the very last person who was sat and who we
> understandably had the least amount of interaction with based on just the situation,
> was married for 20 years to a schoolteacher.  And he said in response to Defense
> questioning that a child isn't actively lying necessarily, even if what's coming out
> of their mouth isn't true.  But most importantly, he's a volunteer clown who spends
> his free time going to places like the Child Abuse Network, an organization I'm
> personally familiar with, and raising spirits of children.  I think he would be a
> wonderful juror.
>
> And so of those three, by process of elimination, I chose to strike the third
> one that's not those two.  I think it has nothing to do with skin color and everything
> to do with the options that were presented to me and the jurors before me.

[Dkt. 13-6, Tr. Trial vol. 2, at 255-56.]  The trial court then inquired, "Any race-neutral reason as

far as [B.B.] besides those?"  [Dkt. 13-6, Tr. Trial vol. 2, at 256.]  Brown continued:

> You mean as far as specifically something I don't like about [B.B.]?  There is
> nothing in particular I don't like about [B.B.] other than she didn't say anything I
> loved.  She did say, It's enough to show one lie; that destroys their credibility,
> during the Defendant's extensive questioning of the panel about credibility of
> witnesses.  So of those three choices when she said, It's enough to show one lie,
> that destroys a witness's credibility, that's a race-neutral reason to not pick her
> among the three alternates.

[Dkt. 13-6, Tr. Trial vol. 2, at 257.]  The trial court allowed the strike of B.B. over Matheson's

objection.  [Dkt. 13-6, Tr. Trial vol. 2, at 257.]

Cortez-Lazcano argues that the OCCA unreasonably affirmed the trial court's ruling as to

this strike because, in addition to the "clear pattern" of discrimination, Brown's stated reason was

19

"nonsensical." [Dkt. 13-6, Tr. Trial vol. 2, at 18.]  That argument requires little discussion because it is premised on a truncated version of Brown's reasons for excusing B.B.  Specifically, Cortez-Lazcano disregards Brown's explanation that she excused B.B. through the "process of elimination" by declining to excuse the two jurors Brown considered more favorable to the prosecution in a child sexual abuse case—a foster mother and a volunteer clown.

Because Brown's proffered reasons for excusing B.B. as the least favorable of the three choices is race-neutral and indicative of permissible trial strategy, not purposeful discrimination, Cortez-Lazcano fails to show that the trial court's factual findings are incorrect or that the OCCA was unreasonable to find that the trial court did not clearly err in rejecting this *Batson* challenge.

### C.      Conclusion

Based on the foregoing analysis, this Court finds and concludes that Cortez-Lazcano is not entitled to federal habeas relief as to the *Batson* claim.  The Court therefore denies the petition as to claim one.

## II.      Ineffective assistance of counsel (*Lafler/Frye* claim)

In his second claim, Cortez-Lazcano alleges he was deprived of his Sixth Amendment right to the effective assistance of trial counsel, as interpreted in *Strickland v. Washington*, 466 U.S. 668 (1984), *Missouri v. Frye*, 556 U.S. 134 (2012) and *Lafler v. Cooper*, 556 U.S. 156 (2012), because his attorney, Matheson, failed to convey a favorable plea offer before trial.  [Dkt. 6, Pet'r's Br., at 21-28.]

### A.      Clearly established federal law

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  U.S. Const. amend. VI; *Strickland*, 466 U.S. 668.  That right includes the right to effective representation during plea negotiations.  *Lafler*, 566 U.S. at 162.  Under *Strickland*, any

defendant alleging ineffective assistance of counsel must show that counsel's performance was deficient and that counsel's deficient performance resulted in prejudice.  466 U.S. at 692.  The *Strickland* standard is "highly deferential" because a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  466 U.S. at 689.  Significantly, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Strickland*, 466 U.S. at 691.  Thus, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  *Id.* at 692.  In 2012, the Supreme Court clarified how reviewing courts should apply *Strickland* when counsel's allegedly deficient performance is based on counsel's failure to timely convey a favorable plea offer, *Frye*, 566 U.S. at 138, or is based on counsel's erroneous advice to reject a favorable plea offer and proceed to trial, *Lafler*, 566 U.S. at 160.

*Frye* involved a defendant who ultimately pleaded guilty and then claimed his counsel was ineffective for not timely communicating an earlier, more favorable plea offer.  566 U.S. at 148. The *Frye* Court discussed both prongs of the *Strickland* test and, as to the performance prong, held "that, as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms that may be favorable to the accused."  566 U.S. at 145.  The *Frye* Court also explained how to assess resulting prejudice, stating,

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

566 U.S. at 147.   Under the facts in *Frye*, the Supreme Court found that counsel performed deficiently.  *Id.* at 149.   But the *Frye* Court did not determine whether the defendant in that case satisfied the prejudice prong because unresolved state-law questions necessitated a remand for that determination.[7]

In *Lafler*, the Supreme Court confronted a different fact pattern:  on advice of counsel, the defendant in *Lafler* rejected a plea offer, was convicted at trial, and received a harsher sentence than he would have had he accepted the plea offer.  566 U.S. at 174.   Because all parties in *Lafler* conceded that counsel performed deficiently in advising the defendant to reject the plea offer, the *Lafler* Court did not discuss *Strickland*'s performance prong.  *Lafler*, 566 U.S. at 174.   Instead, the sole question before the *Lafler* Court was "how to apply *Strickland*'s prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial."  *Lafler*, 566 U.S. at 163.   The *Lafler* Court largely restated its holding from *Frye* (which was decided the same day), holding that a defendant asserting a Sixth Amendment claim in these circumstances

> must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 566 U.S. at 164.

---

[7] The *Frye* Court found it necessary to remand the case to the state appellate court because there were unanswered state law questions regarding withdrawal and acceptance of plea offers that had to be resolved before a reviewing court could determine whether the defendant in that case could show a reasonable probability that the prosecutor would not have withdrawn the offer or that the trial court would not have rejected it.  566 U.S. at 150-51.

Significantly, while *Lafler* and *Frye* modified the *Strickland* standard as applied in the plea-bargaining context, neither case altered existing Supreme Court precedent that has repeatedly reminded federal habeas courts to apply added deference when reviewing a state court's decision applying *Strickland*'s "highly deferential" standard under § 2254(d)'s framework. *See, e.g.*, *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (stating, "We have recognized the special importance of the AEDPA framework in cases involving *Strickland* claims," and concluding that the "the Court of Appeals erred in ordering issuance of a writ of habeas corpus despite ample room for reasonable disagreement about the prisoner's ineffective-assistance-of-counsel claim" and "[i]n doing so . . . clearly violated [the Supreme] Court's AEDPA jurisprudence"); *Burt v. Titlow*, 571 U.S. 12, 15 (2018) ("When a state prisoner asks a federal court to set aside a sentence due to ineffective assistance of counsel during plea bargaining, our cases require that the federal court use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." (quoting *Pinholster*, 536 U.S. at 190)); *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal citations omitted)).

B.     **Analysis**

On the first day of trial, before voir dire, the trial court held a brief hearing to discuss the history of the parties' plea negotiations. [Dkt. 13-5, Tr. Trial vol. 1, at 3-6.] Brown, the sole prosecutor at the time of trial, informed the trial court that the only offer still available was a recommendation of a 25-year sentence in exchange for a guilty plea as to both counts charged in the information. [Dkt. 13-5, Tr. Trial vol. 1, at 7.] Brown also described three plea offers that were noted in the State's case file but were no longer available:

- A memo dated August 15, 2014, reflected that Assistant District Attorney Becky Johnson offered to recommend a sentence of "five in, twenty out," and Cortez-Lazcano rejected that offer at the trial setting in June 2014.  [Dkt. 13-5, Tr. Trial vol. 1, at 4-5.][8]

- A memo dated September 15, 2014, reflected that Johnson offered to recommend a sentence of  "25 suspended," but Cortez-Lazcano rejected the offer.  [Dkt. 13-5, Tr. Trial vol. 1, at 4.]

- A memo dated January 26th, 2015, stated, "Defendant present, not in custody, with Mark Matheson.  The defendant rejects the five suspended on Assault With Intent to Commit a Felony.  And the Defendant sets trial.  Trial set 5/11/15.  File issue[d] to [Brown]."  [Dkt. 13-5, Tr. Trial vol. 1, at 9.]

Most of the discussion at the hearing focused on the third offer, hereafter the "five-year suspended, no-contest plea offer."   Cortez-Lazcano's counsel, Matheson, mentioned this offer before Brown referred to the note in the State's file; Matheson stated:

> The only other offer that I believe is not in there is prior to the last trial setting, there was an offer of a five-year suspended with a reduction in the charge to something that was non-registering sex offender.  That apparently did not make the memo, but that's what we rejected the last time we came back to court back --"

[Dkt. 13-5, Tr. Trial vol. 1, at 5-6.]  Brown then interrupted Matheson to clarify that this offer was, in fact, noted in the State's file and stated that Cortez-Lazcano rejected the offer on January 26, 2015, and that, according to the file, the trial was then reset for May 11, 2015.  [Dkt. 13-5, Tr. Trial vol. 1, at 6, 9.]  When the trial court asked Cortez-Lazcano if he recalled the five-year suspended, no-contest plea offer, Cortez-Lazcano stated, "I remember them telling me they would give me twenty years' probation, two years supervised, and then the rest just like that with no jail

---

[8] Cortez-Lazcano rejected the five in, twenty out plea offer on the record on June 16, 2014. [Dkt. 13-1, Tr. Hr'g, at 1-2.]

time." [Dkt. 13-5, Tr. Trial vol. 1, at 6.]  Matheson then requested an off-the-record discussion. [Dkt. 13-5, Tr. Trial vol. 1, at 6.]

Back on the record, the trial court clarified that the only offer "on the table" was Brown's final offer to recommend 25 years' imprisonment in exchange for a guilty plea as to both charges. [Dkt. 13-5, Tr. Trial vol. 1, at 7.]  Cortez-Lazcano declined that offer.  [Dkt. 13-5, Tr. Trial vol. 1, at 7.]  Matheson then told the trial court that their discussion of plea offers revealed a "bigger problem."  [Dkt. 13-5, Tr. Trial vol. 1, at 7.]  He explained that Cortez-Lazcano "is now telling me he does not remember or remember me telling him about" the five-year suspended, no-contest plea offer.  [Dkt. 13-5, Tr. Trial vol. 1, at 7.]   The trial court asked Matheson if he recalled conveying that offer, and Matheson responded:

> Here's what I do recall, Your Honor:  As an officer of the court, I remember going to [Judge Tom] Gillert's, I remember talking to the prosecutor.  The prosecutor says if he's not going to  -- what would he take?  And I said A, it's going to have to be something that's non-sex offender and no prison to a no contest plea.  I do remember talking to the prosecutor.  Now, did I come out and write that down for him?  I don't know.  I do remember the conversation with the prosecutor.  It would be my normal procedure to tell him that.  But I really think what happened possibly is [Judge] Gillert came out and said, Hey, you're not up, bring us back there and gave us a new date.  That's probably about the extent – or the in-depthness of the discussion about the offer.

[Dkt. 13-5, Tr. Trial vol. 1, at 8.]  The trial court noted that the five-year suspended, no-contest plea offer was no longer available, regardless of whether Matheson conveyed that offer to Cortez-Lazcano.  [Dkt. 13-5, Tr. Trial vol. 1, at 8.]  Matheson further stated, "For the record, I'm saying without any amount of certainty whatsoever, I knew I got the offer from the State and it's normally my practice and procedure to relay that offer to the client."  [Dkt. 13-5, Tr. Trial vol. 1, at 8-9.] Matheson continued:

> But I can't say with any amount of certainty - - and it was not on the record that he rejected that offer at that point.  So if he's saying he didn't get that or know that he could plea a no-contest or a quasi-*Alford* plea, the weight of the evidence and the magnitude of this case, he could enter a plea of no contest or an *Alford* plea and not

serve any prison time and be a registered sex offender, I may not have explained that in-depth for him.

[Dkt. 13-5, Tr. Trial vol. 1, at 9.]  Brown argued that Matheson twice requested trial settings after rejecting the five-year suspended, no-contest plea offer, thereby confirming his rejection of that offer.  [Dkt. 13-5, Tr. Trial vol. 1, at 9-10.]

Citing *Strickland*, *Frye*, and *Lafler*, Cortez-Lazcano claimed on direct appeal that Matheson provided ineffective assistance by failing to convey the five-year suspended, no-contest plea offer, submitted affidavits from Matheson and himself, and requested an evidentiary hearing. The OCCA denied Cortez-Lazcano's request for an evidentiary hearing and found no Sixth Amendment violation, reasoning:

> In Proposition Two, and a contemporaneously filed *Motion for Supplementation of the Record and Request to Remand for Evidentiary Hearing*, Appellant argues that trial counsel's failure to convey a plea bargain offer was ineffective assistance of counsel.  We review this claim according to the two-part deficient performance and prejudice standard of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984).

> Pursuant to Rule 3.11(B)(3)(b), *Rules of the Court of Criminal Appeals*, 22 O.S. Supp. 2016, Ch. 18, App., we review Appellant's motion to supplement the record and attached submissions to determine whether they contain "clear and convincing evidence that there is a strong possibility trial counsel was ineffective" under the *Strickland* test.  This test is less demanding than *Strickland* itself, and the denial of such a motion to supplement the record necessarily includes a finding that no *Strickland* violation occurred.  *Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

> From our consideration of Proposition Two, the trial record, and the affidavits in the *Motion for Supplementation of the Record and Request to Remand for Evidentiary Hearing*, we find it most probable that the offer to plead guilty to a lesser charge for a five (5) year suspended sentence was made; and that defense counsel conveyed that offer to Appellant, who rejected it and asked for a jury trial. We further find that even if this offer was not conveyed by counsel, there is no reasonable probability that Appellant would have accepted it.  Appellant testified at trial that he had pled not guilty and consistently demanded a jury trial, and denied any wrongdoing against the complaining witness.  Appellant does not show clear and convincing evidence of a strong possibility that trial counsel was ineffective. Proposition Two and the motion requesting to supplement the appeal record are denied.

[Dkt. 12-1, OCCA Op., at 4.]

Cortez-Lazcano contends the OCCA's decision on this claim is based on an unreasonable determination of the facts and an unreasonable application of *Strickland*, *Frye*, and *Lafler*.  [Dkt. 6, Pet'r's Br., at 21-26.]   Whitten disagrees and contends that § 2254(d) bars relief.  [Dkt. 12, Resp., at 23-33.]

The Court agrees that Cortez-Lazcano cannot overcome § 2254(d)'s bar to habeas relief. Admittedly, there is some evidence in the record that supports Cortez-Lazcano's assertion that neither he nor Matheson remembers discussing the five-year suspended, no-contest plea offer. Matheson made statements during the pretrial plea negotiations hearing and in his affidavit reflecting that he did not have any specific recall of conveying that offer.  [Dkt. 12-5, Matheson Aff., at 8-9; Dkt. 13-5, Tr. Trial vol. 1, at 2-9.]  Similarly Cortez-Lazcano stated at the hearing that he did not remember that offer and, in his affidavit, he states that he would have accepted that offer had Matheson conveyed it.  [Dkt. 13-5, Tr. Trial vol. 1, at 2-9; Dkt. 12-5, Cortez-Lazcano Aff., at 7.]

But there is other evidence in the record that supports the OCCA's finding that it is "most probable" that Matheson conveyed that offer to Cortez-Lazcano and that Cortez-Lazcano rejected it.  For example, during the pretrial plea negotiation hearing, it was Matheson who first mentioned the five-year suspended, no-contest plea offer, and after describing the terms, he stated, "but that's what we rejected the last time we came back to court."  [Dkt. 13-5, Tr. Trial vol. 1, at 5-6.]  Brown interrupted Matheson to clarify that this offer was noted in the State's file with an indication that Cortez-Lazcano rejected the offer on January 26, 2015, and that the trial was reset for May 11, 2015.  [Dkt. 13-5, Tr. Trial vol. 1, at 6, 9.]  After his off-the-record discussion with Cortez-Lazcano, Matheson informed the trial court that while he could not recall conveying the five-year

suspended, no-contest plea offer to Cortez-Lazcano, he did recall discussing that offer with a prosecutor (not Brown) when they appeared before Judge Gillert.  Because Matheson's recall of that discussion suggests that the terms of the five-year suspended, no-contest plea offer were nearly identical to the terms that Matheson told the prosecutor Cortez-Lazcano would have seriously considered, it is reasonable to infer that he would have conveyed that offer to Cortez-Lazcano. [Dkt. 13-5, Tr. Trial vol. 1, at 8.]  The state court docket sheet reflects that Cortez-Lazcano appeared before Judge Gillert three times between September 15, 2015, when he rejected the 25-suspended plea offer, and January 26, 2015, when the State's notes indicate he rejected the five-year suspended, no-contest plea offer.  [Dkt. 13-10, O.R., at 11.]  At each appearance before Judge Gillert, the case was called for jury trial and passed to a new date.  [Dkt. 13-10, O.R., at 11.]  On January 26, 2015, Cortez-Lazcano appeared before Judge William LaFortune, the case was called for jury trial, the case was continued at the State's request, "[d]efendant ha[d] no objection," and the trial was reset for May 11, 2015.  [Dkt. 13-10, O.R., at 11.]  This sequence of events suggests that Matheson could have discussed the five-year suspended, no-contest plea offer with a prosecutor during any one of the three appearances before Judge Gillert.  And Matheson told he trial court that "it's normally [his] practice and procedure" to relay offers to his clients.  [Dkt. 13-5, Tr. Trial vol. 1, at 8-9.].  In his posttrial affidavit, Matheson also stated that in his 20 years of practice he has had "the custom of relating any and all plea bargain offers to my clients."  [Dkt. 12-5, Matheson Aff., at 9.]  Further, at the sentencing hearing, Matheson urged the trial court to impose a 25-year suspended sentence, stating,

> As the Court is aware of, years prior to the jury trial, it was either a year or maybe a year and a half while Ms. Brown was on maternity leave, other prosecutors who had the case and reviewed it thought the case was worth a five-year suspended and a reduction down to a non-sex offense.  And Mr. Cortez-Lazcano *rejected that offer* and has maintained his innocence throughout this matter.

But I think it would be important for the Court to consider that, that offer of the State. And, you know, they deal with these cases every day, and they thought this case was at one point only worth a five-year suspended non-sex crime.

[Dkt. 13-4, Tr. Sentencing Hr'g, at 4-5 (emphasis added).]  On these facts, it was objectively reasonable for the OCCA to find it was "most probable" that Matheson conveyed the five-year suspended, no-contest plea offer and that Cortez-Lazcano rejected that offer.  Thus, it was also objectively reasonable for the OCCA to determine that, even in light of *Frye*, Cortez-Lazcano failed to demonstrate deficient performance.

Likewise, it was objectively reasonable for the OCCA to determine that Cortez-Lazcano failed to demonstrate prejudice.  As discussed, one portion of the *Lafler/Frye* prejudice test requires the defendant to show that had the plea offer at issue been conveyed, the defendant would have accepted it.  *Lafler*, 566 U.S. at 164; *Frye*, 566 U.S. at 150.  Cortez-Lazcano appears to argue that the OCCA reached its conclusion regarding prejudice by disregarding his sworn statement in his posttrial affidavit that he would have accepted the five-year suspended, no-contest plea had he known about it.  [Dkt. 6, Pet'r's Br., at 25-26; Dkt. 12-5, Cortez-Lazcano Aff., at 7.]  The OCCA's decision reflects that it considered that affidavit as well as other evidence in the record in assessing prejudice.  *See Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013) ("[E]ven in cases where the OCCA summarily disposes of a defendant's Rule 3.11 application without discussing the non-record evidence, we can be sure that the OCCA in fact considered the non-record evidence in reaching its decision.").  That is consistent with *Strickland*, *Frye*, and *Lafler*.  In each case, the Supreme Court explained that assessing prejudice is a holistic endeavor.  *See Lafler*, 566 U.S. at 160, 164 (identifying showings defendant must make to establish prejudice when counsel's deficient performance during plea negotiations "caused nonacceptance of a plea offer and further proceedings led to a less favorable outcome"); *Frye*, 566 U.S. at 149-51 (describing various factors that are relevant to the prejudice analysis); *Strickland*, 466 U.S. at 695 ("In making [the prejudice]

determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury").  Here, the OCCA reasoned that Cortez-Lazcano's clear statement in his affidavit that he would have accepted the five-year suspended, no-contest plea offer had to be considered in the context of his demonstrated record of rejecting pretrial plea offers, Matheson's statements at the pretrial plea negotiations hearing, Matheson's statements at the sentencing hearing, and the State's case file note, all of which indicated that Cortez-Lazcano rejected the five-year suspended, no-contest plea offer, and Cortez-Lazcano's trial testimony.  Cortez-Lazcano testified at trial that he entered a not guilty plea at his first opportunity to do so and asked for a jury trial, maintained his innocence from the time he was charged in 2013 to the time he was tried in 2016, and continuously requested his jury trial rights "[b]ecause [he] didn't do anything of the stuff that [V.C.] said [he had] done and [he's] not going to plead to something that [he] didn't do." [Dkt. 13-9, Tr. Trial vol. 5, at 107.]  This evidence not only supports the OCCA's conclusion that Matheson most probably conveyed the five-year suspended, no-contest plea offer, but also supports the OCCA's conclusion that Cortez-Lazcano failed to show a reasonable probability that he would have accepted the offer and thus failed to establish prejudice under *Lafler* and *Frye*.

### C.    Conclusion

On the record presented, Cortez-Lazcano cannot show that the OCCA's decision on his *Lafler/Frye* claim either is contrary to or involves an unreasonable application of clearly established federal law or is based on an unreasonable determination of the facts presented in state court.  Section 2254(d) thus bars relief and the Court denies the petition as to the claim asserted in ground two.

### III.   Inadequate notice of the charges (*Russell* claim)

Next, Cortez-Lazcano claims that the charging document failed to meet minimal Sixth and

Fourteenth Amendment standards, as interpreted in *Russell v. United States*, 369 U.S. 749, 763-64

(1962), because the State charged him with two sex offenses, alleged both occurred over the same

broad five-year period, and presented evidence of multiple acts of sexual abuse that he committed

against V.C. over that five-year period.  [Dkt. 6, Pet'r's Br., at 27-30.].

### A.   Clearly established federal law

The Supreme Court has identified "two constitutional requirements" regarding the

adequacy of a charging document.  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  A

charging document "is sufficient if it [1] contains the elements of the offense charged and fairly

informs a defendant of the charge against which he must defend, and [2] enables him to plead an

acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United*

*States*, 418 U.S. 87, 117 (1974); *see also Russell*, 369 U.S. 749, 763-64 (1962) (describing

adequate notice and the ability to plead a former acquittal or conviction to bar a future prosecution

for the same offense as "two of the protections which an indictment is intended to guarantee").

### B.   Analysis

The State initiated Cortez-Lazcano's prosecution in this case by filing an information

alleging:

Count 1, 21 O.S. 843.5F

Daniel Cortez-Lazcano, on or about between 12/27/2007 and 10/5/2012, in Tulsa
County, State of Oklahoma and within the jurisdiction of this Court, did commit
the crime of sexual abuse-child under 12, a Felony, by willfully or maliciously
putting his penis in the vagina of V.C., a child under the age of 12, to-wit: between
the ages of 5 and 9.  The defendant, Daniel Cortez-Lazcano, was a person
responsible for the care of V.C.

Count 2, 21 O.S. 843.5F

> Daniel Cortez-Lazcano, on or about between 12/27/2007 and 10/5/2012, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of sexual abuse-child under 12, a Felony, by willfully or maliciously touching the vagina of V.C., a child under the age of 12, to-wit: between the ages of 5 and 9.  The defendant, Daniel Cortez-Lazcano, was a person responsible for the care of V.C.

[Dkt. 13-10, O.R., at 19.]

Cortez-Lazcano first challenged the adequacy of the charging document on direct appeal. There, he asserted that the State "failed to provide [him] with adequate notice of the offense he was charged with committing as required by the Fourteenth Amendment to the United States Constitution as well as relevant provisions of Oklahoma law." [Dkt. 12-2, Appellant's Br., at 44.] Relying almost exclusively on state law, he argued that Oklahoma prosecutors exercise "free rein" when drafting overly broad charging documents "in child sex abuse cases." [Dkt. 12-2, Appellant's Br., at 44-47.]  Cortez-Lazcano briefly mentioned that overly broad charging documents implicate "double jeopardy," but he then stated that "the acquittal in Count Two avoids double punishment and double jeopardy issues." [Dkt. 12-2, Appellant's Br., at 46.]

The OCCA denied his claim, stating,

> Proposition Seven argues that the information denied Appellant adequate notice of the charges in violation of due process.  Okla. Const. Art. II, § 7; U.S. Const. amend. XIV.  Failure to demur or move to quash or set aside an information prior to a plea to the merits waives all non-jurisdictional defects, Nealy v. State, 1981 OC CR 142, ¶ 4, 636 P.2d 378, 380, including the lack of sufficient notice. Parker v. State, 1996 OK CR 19, ¶ 21, 917 P.2d 980, 985.  We review Appellant's proposition only for plain error, as defined above, and find none.  Proposition Seven is denied.

[Dkt. 12-1, OCCA Op. 7.]

In this proceeding, Cortez-Lazcano appears to argue that the OCCA's decision is contrary to clearly established federal law for two reasons.  First, he argues that the State's failure to allege different and specific time frames for each count "ran afoul of the Constitution's mandated requirement that the State must give the accused sufficient notice of the charges against him" and

deprived him of the ability to "plead double jeopardy to bar any subsequent prosecution by the State for the same offense for which he was ultimately convicted at trial," and, for these reasons, failed to satisfy *Russell*'s mandates.  [Dkt. 6, Pet'r's Br., at 27-29.]  Second, he argues that there is "a systemic problem in Oklahoma regarding the basic notice requirements of charging documents established by the Supreme Court in *Russell* as it relates to child sex abuse cases" and that this problem was acknowledged by the concurring opinion in *Champlain v. State*, No. F-2014-1078 (Okla. Crim. App. 2016).  [Dkt. 6, Pet'r's Br., at 29-30; Dkt. 6-2 (*Champlain* opinion).]  Whitten contends § 2254(d) bars relief as to this claim.  [Dkt. 12, Resp., at 33-39.]

For three reasons, the Court agrees that Cortez-Lazcano is not entitled to federal habeas relief as to this claim.  First, to the extent he argues the OCCA's rejection of his claim is contrary to *Russell*, that argument lacks merit.  In *Lopez v. Smith*, 574 U.S. 1, 5-6 (2014), the Supreme Court described *Russell* as one of its decisions "that stand[s] for nothing more than the general proposition that a defendant must have adequate notice of the charges against him."  Conversely, in *Resendiz-Ponce*, the Supreme Court described *Russell* as narrowly holding that "a valid indictment" charging a defendant under 2 U.S.C. § 192—which "mak[es] it a crime for a witness summoned before a congressional committee to refuse to answer any question "pertinent to the question under inquiry"—"must go beyond the words of § 192 and allege the subject of the congressional hearing in order to determine whether the defendant's refusal was 'pertinent.'"  *Resendiz-Ponce*, 549 U.S. at 109-10.  Obviously, *Russell*'s narrow holding says nothing about requiring an Oklahoma prosecutor to provide a defendant with a different and specific time period for each violation of Okla. Stat. tit. 21, § 843.5(F) alleged against a defendant accused of sexually abusing a child.  And *Russell*'s  "general proposition[s] that a defendant must have adequate notice of the charges against him" and the ability to plead a former acquittal or conviction to bar a future

prosecution for the same offense[9] are "far too abstract to establish clearly the specific rule" that Cortez-Lazcano seems to suggest the OCCA should have applied here to conclude that his information failed to meet *Russell*'s mandates.  *Smith*, 574 U.S. at 5-6; *see also Eldridge v. Bear*, 833 F. App'x 736, 747-48 (10th Cir. 2020) (unpublished)[10] (concluding that reasonable jurists would not debate the district court's determination that § 2254(d) barred relief on petitioner's claim that the amended information charging him with 31 sex offenses was "impermissibly vague" when petitioner did nothing more than "point[] to the Supreme Court's *Russell* decision" and "mak[e] conclusory statements about the charging instrument failing to fully satisfy the 'mandates of *Russell*'").  Cortez-Lazcano thus fails to show that the OCCA's decision is contrary to *Russell*.

Second, he fails to identify any other Supreme Court precedent that might support his claim that the information in this case failed to satisfy constitutional standards because the State "used the same time frame for each allegation in the charging document."  [Dkt. 6, Pet'r's Br., at 27.] That failure is understandable given the absence of any such precedent.  *See, e.g.*, *Crawford v. Pennsylvania*, 714 F. App'x 177, 180 (3d Cir. 2017) (unpublished) (recognizing that "Supreme Court precedent in this area is very general and lacks a specific application to the problems encountered in prosecutions of child sexual abuse."); *Burling v. Addison*, 451 F. App'x 761, 766

---

[9] As Whitten points out, it would have been objectively reasonable for the OCCA to conclude that Cortez-Lazcano's double-jeopardy concern is unfounded.  [Dkt. 12, Resp., at 36 n.12.]  *See Kimbro v. State*, 857 P.2d 798, 799-800 (Okla. Crim. App. 1990) (concluding that defendant who challenged adequacy of notice in charging document that alleged he committed two counts each of forcible anal sodomy and forcible oral sodomy during the same five-month period had sufficient notice of the charges against him and was "not exposed to double jeopardy" because "jeopardy has attached to all alleged sexual acts between Appellant and D.L. during the period of time specified in the Information").

[10] The Court finds *Eldridge* and the other unpublished decisions cited below particularly persuasive on the issue of the adequacy of charging documents in child sexual abuse cases and cites them for that reason.  Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

(10th Cir. 2011) (unpublished) (noting habeas petitioner's failure to "identify any Supreme Court opinion that would require his charging document to specify the time and location of the offense to inform him fairly of the [child sexual abuse] charges against him"); *Hunter v. New Mexico*, 916 F.2d 595, 596-97, 600 (10th Cir. 1990) (citing a First Circuit decision and state court decision to summarily reject, in pre-AEDPA case, habeas petitioner's "argument that the information was deficient in failing to identify specific dates for the crimes alleged" in a child sexual assault case). But "the absence of clearly established federal law is dispositive under § 2254(d)(1)." *House*, 527 F.3d at 1018.

Third, regardless of whether the OCCA has previously recognized "a systemic problem" in Oklahoma regarding charging documents in child sexual abuse cases, or whether the OCCA may someday adopt specific rules to address that problem, those rules necessarily would not constitute clearly established federal law for purposes of habeas review. *Andrade*, 538 U.S. at 71. Thus, to the extent Cortez-Lazcano argues that the OCCA in this case should have determined the information was constitutionally inadequate by adopting the reasoning of the concurring opinion in *Champlain v. State*, No. F-2014-1078 (Okla. Crim. App. 2016), that argument simply has no bearing on this Court's consideration of the OCCA's decision under § 2254(d).

### C.   Conclusion

For the reasons stated, the OCCA's decision is not contrary to *Russell*. And Cortez-Lazcano does not identify any other Supreme Court precedent that requires a state to allege a different and specific time frame for each separate count of child sex abuse charged in an indictment or information. The Court therefore finds no basis to grant federal habeas relief as to this claim and denies the petition as to the claim asserted in ground three.

IV.     **Prosecutorial misconduct (*Darden* claim)**

In his fourth and final claim, Cortez-Lazcano claims that several instances of prosecutorial misconduct deprived him of his Sixth and Fourteenth Amendment rights to a fair trial.  He alleges the prosecutor committed misconduct by (1) presenting evidence of multiple acts and arguing that the jury did not have to be unanimous in "picking" which offense constituted the crime, (2) misdescribing the presumption of innocence during voir dire, (3) forcing Cortez-Lazcano to call V.C. a "liar" during cross-examination, (4) vouching for V.C.'s credibility during closing argument, and (5) eliciting sympathy for V.C. during closing argument.  [Dkt. 6, Pet'r's Br., at 31-36.]

A.      **Clearly established federal law**

General allegations of prosecutorial misconduct can establish a constitutional violation only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  A reviewing court evaluating a prosecutorial-misconduct claim must consider the prosecutor's allegedly improper remarks or actions in the context of the "entire proceedings, including the strength of the evidence against the defendant." *Hanson v. Sherrod*, 797 F.3d 810, 843 (10th Cir. 2015).  Because this "standard is a very general one," *Parker v. Matthews*, 567 U.S. 37, 48 (2012), reviewing courts have "more leeway . . in reaching outcomes in case-by-case determinations," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Federal habeas courts necessarily must consider that "leeway" in determining whether a state court has unreasonably applied the due-process standard in adjudicating a prosecutorial-misconduct claim. *Parker*, 567 U.S. at 48-49.

36

## B.   Analysis and conclusion

Cortez-Lazcano raised on direct appeal the same prosecutorial-misconduct claim he presents here.  [Dkt. 12-2, Appellant's Br., at 47-55.]  The OCCA identified his prosecutorial-misconduct claim as one implicating his constitutional rights to "a fair and impartial trial."  [Dkt. 12-1, OCCA Op., at 7.]  But the OCCA denied relief, reasoning,

> Some of the challenged comments and tactics drew objections which were overruled; others drew no objection, waiving all but plain error.  The relevant question is whether the prosecutor's tactics and comments so infected the trial as to make the resulting conviction fundamentally unfair.  *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986).  We evaluate the prosecutor's conduct within the context of the entire trial, considering not only the prosecutor's actions, but also the strength of the evidence and the corresponding arguments of defense counsel.  *Sanders v. State*, 2015 OK CR 11, ¶ 21, 358 P.3d 280, 286.  Considering the challenged comments and tactics both individually and cumulatively, we find no relief is warranted.

[Dkt. 12-1, OCCA Op., at 7.]

In his brief, Cortez-Lazcano reasserts the same arguments he presented to the OCCA, explains why the prosecutor's challenged comments were contrary to state law, and concludes that the cumulative effect of the prosecutor's misconduct was prejudicial because the Constitution prohibits prosecutors from striking "foul" blows and using improper methods to produce a wrongful conviction.  [Dkt. 6, Pet'r's Br., at 31-36.]; *see Berger v. United States*, 295 U.S. 78, 88 (1935) ("[W]hile [a prosecutor] may strike hard blows, [s]he is not at liberty to strike foul ones.  It is as much [her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.").

What Cortez-Lazcano does not do in his brief, however, is argue, or even suggest, that the OCCA's decision on his prosecutorial-misconduct claim is contrary to or based on an unreasonable application of *Darden*.  Nor does he argue that the OCCA's decision is based on an unreasonable determination of the facts regarding the prosecutor's conduct.  Rather, he boldly asserts that his

view that the prosecutor's conduct was prejudicial "is correct," thus implying that the OCCA's rejection of his claim is incorrect. [Dkt. 6, Pet'r's Br., at 35.] But the AEDPA and Supreme Court precedent places the burden on a habeas petitioner to show that the state court's decision on his or her federal claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Cortez-Lazcano's apparent assertion that the OCCA's decision is incorrect falls well short of making that showing and provides this Court with no basis to disturb the OCCA's decision rejecting his prosecutorial-misconduct claim.

Despite his failure to make any viable argument under § 2254(d), the Court has reviewed the prosecutor's challenged comments and tactics in light of the entire record and in light of the leeway afforded to the OCCA in adjudicating a *Darden* claim. Having done so, the Court concludes that even if he had tried, Cortez-Lazcano could not make the showings required by § 2254(d). The Court therefore denies the petition as to the claim asserted in ground four.

### CONCLUSION

Based on the foregoing analysis, the Court concludes that Cortez-Lazcano has not established that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The Court therefore denies his petition for a writ of habeas corpus.

### Certificate of Appealability

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, requires a district court "issue or deny a certificate of appealability when it enters a final order adverse to the [petitioner]." The district court may issue a certificate of appealability (COA) "only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

For the reasons discussed in the analysis section, the Court concluded that Cortez-Lazcano has not shown that he is entitled to federal habeas relief as to any of his constitutional claims. Nonetheless, the Court concludes that reasonable jurists could disagree with the Court's assessment of his *Batson* claim and his *Lafler/Frye* claim. The Court therefore issues a certificate of appealability as to the claims asserted in grounds one and two of the petition. The Court declines to issue a certificate of appealability as to the claims asserted in grounds three and four.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of Rick Whitten in place of Jimmy Martin as party respondent.

2. Cortez-Lazcano's request for an evidentiary hearing is **denied**.

3. The petition for writ of habeas corpus (Dkt. 1) is **denied**.

4. A certificate of appealability is **granted** as to (a) the *Batson* claim asserted in ground one and (b) the *Lafler/Frye* claim asserted in ground two.

5. A certificate of appealability is **denied** as to the claims asserted in grounds three and four.

6. A separate judgment shall be entered in this matter.

**DATED** this 24th day of March 2022.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE